## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles R. Norgle | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 CR 657 | **DATE** | 1/29/2002 |
| **CASE TITLE** | UNITED STATES OF AMERICA vs. VINCENT LANE | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter opinion and order denying defendant's motions for release pending appeal and for extension of the date of surrender.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | 2 number of notices | |
| ✓ | Notices mailed by judge's staff. | | |
| ✓ | Notified counsel by telephone. | JAN 30 2002 date docketed | |
| ✓ | Docketing to mail notices. | | 113 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | 1/29/2002 date mailed notice | |
| EF | courtroom deputy's initials | EF mailing deputy initials | |

U.S. DISTRICT COURT
CLERK
02 JAN 29 PM 4: 32
FILED-ED. TO

Date/time received in
central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | No. 00 CR 0657 |
| | ) | HONORABLE CHARLES R. NORGLE |
| VINCENT LANE, | ) | |
| | ) | DOCKETED |
| Defendant. | ) | |

JAN 3 0 2002

**OPINION AND ORDER**

CHARLES R. NORGLE, Sr., District Judge:

Before the court are Defendant Vincent Lane's motions for release pending appeal and for

extension of the date of surrender. On January 15, 2002, the court issued a minute order denying the

motions, and stating that a full opinion would follow giving the court's reasons in accordance with

United States v. Swanquist, 125 F.3d 573 (7th Cir. 1997). The reasons for the denials are outlined

below.

## I.  BACKGROUND

In a nine count superceding indictment, Lane was charged with one count of violating 18

U.S.C. § 1344 and eight counts of violating 18 U.S.C. § 1014, all of which arose out of statements

Lane made in connection with various loans he obtained. Lane's scheme involved several entities

and transactions, which the court summarizes below.

At all times relevant, Lane was a one-third owner of a general partnership called LSM

Venture Associates ("LSM"), which was involved in multiple real estate dealings. In the early

1980's, LSM was the general partner of several other limited partnerships involving real estate. One

such undertaking was an apartment complex in Texas called Casa Bonita Apartments, which was

owned by Casa Bonita Apartments, Limited and Casa Bonita Investors, Limited ("Casa Bonita

entities"). LSM was the general partner of both Casa Bonita entities. In 1982, the Casa Bonita entities borrowed a large sum of money from National Income Realty Trust ("NIRT"). Lane signed a note on behalf of the Casa Bonita entities, and personally guaranteed the note.

In the mid 1980's LSM was also a general partner in an entity called Continental Commercial Partners ("CCP"). CCP had another general partner, Full Life, Inc., a corporation controlled by the Lake Region Conference Association of Seventh Day Adventists ("Seventh Day Adventists"). LSM and the Seventh Day Adventists each owned 49.5% of CCP. Lane personally owned the remaining 1% of CCP.

During the mid 1980's CCP purchased from Loyola University of Chicago ("Loyola") real estate located at 76th and Racine on the south side of Chicago for the purpose of developing a shopping center known as Continental Plaza. CCP held this property in a land trust at the American National Bank and Trust Company of Chicago ("ANB").

In order to purchase the property from Loyola, CCP obtained financing from several sources, most of which was secured by mortgages on the property and by personal guarantees. The first lien on the property was held by Lloyds Bank International, Limited, whose agent in the United States was Daiwa Bank, Limited (collectively "Daiwa"). The second lien on the property was held by Drovers Bank of Chicago, which became Cole Taylor Bank (hereinafter "Cole Taylor"). Loyola, in turn, guaranteed $1,916,000.00 of the debt to Cole Taylor.

Continental Plaza opened for business in 1988, with a grocery store occupying more than 40% of the center, and acting as the anchor tenant. In order for Continental Plaza to be financially viable, it was necessary that the anchor tenant space be leased.

Also in 1988, the Casa Bonita entities defaulted on the loan from NIRT, and failed to pay the money due on the note. In September 1991, NIRT gave written notice of demand on Lane to cure the default and pay the amount due. Lane did not do so, and on January 24, 1992, NIRT sued Lane in state court in Texas seeking $1,500,000.00 in unpaid principal and $300,000.00 in interest.

In the early part of 1992, CCP was several million dollars in debt on Continental Plaza. CCP owed $3,000,000.00 to Daiwa, and $2,000,000.00 to Cole Taylor. Daiwa filed a suit in 1992 seeking to foreclose on Continental Plaza. A judgment of foreclosure was entered, and a sheriff's sale was ordered. Both Lane and the Seventh Day Adventists stood to be personally liable if the sale of Continental Plaza resulted in a shortfall on the debt owed. Cole Taylor also filed suit in 1992, seeking to enforce the personal guarantees made in connection with the financing of Continental Plaza. Cole Taylor obtained a judgment against Lane personally, and began attempts to collect on that judgment.

In late 1992, the grocery store that was the anchor tenant at Continental Plaza closed, and the anchor space became vacant. At that time, the Daiwa and Cole Taylor lawsuits were still pending against Lane. Around that same time, unbeknownst to Lane, Loyola agreed to pay Cole Taylor $1,700,000.00 on Loyola's guaranty to Cole Taylor. In return, Cole Taylor agreed to return to Loyola 90% of any money that Cole Taylor collected from other sources. As will be seen later, Cole Taylor honored this obligation to Loyola.

In early 1993, Lane proposed a refinancing plan for Continental Plaza that would result in the dismissal of the Daiwa and Cole Taylor lawsuits, and resurrection of Continental Plaza as a viable shopping center. Lane's refinancing plan included the following elements: (1) the Seventh Day Adventists would contribute $2,500,000.00, in return for their release from all liabilities on their

3

personal loan guarantees, and their interest in CCP would be converted to a limited partnership; (2) Daiwa would receive $2,500,000.00 as full payment on the debt CCP owed Daiwa, and dismiss its lawsuit; (3) ANB would issue a new loan for $1,900,000.00, which would be secured by a first mortgage on Continental Plaza, and further secured by an agreement from Loyola to purchase the loan if it went into default; and (4) Cole Taylor would receive $1,600,000.00 as partial payment on CCP's debt to Cole Taylor, take as security a second mortgage subordinate to ANB's lien, and dismiss its lawsuit.

When analyzing Lane's proposed refinancing, ANB determined that a viable anchor tenant was necessary to the success of both Continental Plaza and Lane's refinancing plan. In May 1993, Lane produced to ANB a copy of a lease for the anchor tenant space at Continental Plaza, which was dated May 7, 1993. Lane's proposed tenant was another grocery store called "Your Supermarket, Inc." The signatory for Your Supermarket was Mr. Franklin Searcy, who signed on behalf of Leonard Muhammad, the controlling person of Your Supermarket. Muhammad testified that he is the son-in-law of Minister Louis Farrahkan, the leader of a religious order known as The Nation of Islam. Muhammad further testified that he is employed as the chief of staff for The Nation of Islam. Your Supermarket agreed to lease the anchor space for five years at a rate of $120,000.00 per year, with no provision for a security deposit. The lease indicated that the landlord was ANB as trustee. At the time, ANB had not signed the lease, and the lease was therefore not binding.

In early August 1993, Lane on behalf of CCP, and ANB signed a commitment letter for the $1,900,000.00 refinancing loan. The commitment letter outlined the following conditions that had to be met before ANB would issue the loan: (1) Loyola had to sign the loan purchase agreement; (2) CCP had to tender a fully executed version of the May 7, 1993 lease with Your Supermarket; (3)

4

CCP had to tender an Estoppel Certificate signed by Your Supermarket, certifying that the May 7, 1993 lease was in effect; (4) CCP had to tender financial statements for Your Supermarket, or alternatively, obtain a $240,000.00 security deposit from Your Supermarket; (5) CCP had to sign a Mortgage and a Collateral Assignment of Leases and Rents as further security for the loan; and (6) Lane had to sign a personal guaranty for repayment of the loan.

The principals of Your Supermarket had little experience in grocery operations. Accordingly, in August 1993, Lane arranged for Muhammad to meet with Reverend Wilbur Daniels, who was experienced in real estate development. Reverend Daniels and Muhammad originally explored being partners in the supermarket, but that did not come to pass. Reverend Daniels decided that if Your Supermarket was to proceed, it would have to be owned primarily by him or his representatives. But, eventually Reverend Daniels and his associates discontinued discussions with Lane about opening a supermarket at Continental Plaza. As it turned out, no supermarket ever opened again at Continental Plaza. There is, however, more to be said about the $240,000.00 security deposit.

Beginning in September 1993, Lane made several statements. The Government alleged that on October 21, 1993, Lane fraudulently directed ANB, in its capacity as landlord and trustee, to: (1) execute the May 7, 1993 lease for Your Supermarket to take the anchor space at Continental Plaza; (2) execute a Mortgage on the Continental Plaza property, which Lane signed as the beneficiary on October 29, 1993; and (3) execute a Collateral Assignment of Leases and Rents, which Lane signed as the beneficiary on October 29, 1993, all for the purpose of securing the $1,900,000.00 refinancing loan.

On November 1, 1993, Lane's refinancing deal on Continental Plaza took place. The Government alleged that on that date Lane took several more fraudulent actions, many of which

surround the lease for the anchor space. According to the Government, on November 1st, Lane directed ANB to execute an amendment to the May 7th lease. The amendment changed the identity of the anchor tenant from Your Supermarket to an entity called "Shoppers Lane Supermarket, Inc." The amendment also stated that Shoppers Lane adopted, ratified and confirmed the lease as if it had been entered into by Shoppers Lane, and that the amended lease was in full force and effect. In the amendment, Muhammad confirmed Searcy's authority to sign on Muhammad's behalf. Under the amended lease, the obligation to pay rent would begin on December 1, 1993, and the annual rent was increased from $120,000.00 per year to $180,000.00 per year. The amended lease also indicated that Shoppers Lane had paid a security deposit of $240,000.00 to ANB as landlord, which ANB could use for closing costs in connection with the refinancing of the shopping center.

According to the Government, both the May 7, 1993 lease and the November 1, 1993 amendment were shams and worthless because neither Your Supermarket nor Shoppers Lane were viable tenants. Thus, according to the Government, Lane's tender to ANB of the lease and amendment, the Estoppel Certificate, and the Collateral Assignment of Leases and Rents were all fraudulent because each of the documents depended on Your Supermarket/Shoppers Lane being a bona fide tenant. Moreover, the Government claimed that Shoppers Lane did not pay the $240,000.00 security deposit. Rather, Lane personally borrowed that money from Reverend Daniels and used it as the security deposit.

Also on November 1, 1993, Lane fraudulently tendered to ANB a Guaranty of Payment, stating that except as disclosed in writing, there was no action pending that might adversely affect his ability to honor his guarantee, and that he was not in default under any agreements to which he

was a party. These representations were fraudulent because Lane did not disclose to ANB the NIRT lawsuit in Texas against Lane and the Casa Bonita entities.

As noted above, under the originally proposed refinancing plan, Cole Taylor was to receive $1,600,000.00 from ANB. As events came to pass, on November 1, 1993 when Lane's refinancing deal concluded, Cole Taylor accepted a lower final figure of $1,450,000.00 and dismissed its lawsuit. Then, in accordance with Cole Taylor's agreement with Loyola, of which Lane was unaware, Cole Taylor paid Loyola $1,350,000.00.

Neither Shoppers Lane nor Your Supermarket opened in the anchor tenant space at Continental Plaza. No rent was ever paid on the anchor space lease. On February 16, 1994, Lane met with ANB and its attorney to discuss the non-opening of the grocery store. The Government alleged that Lane fraudulently told ANB that he had forestalled opening Shoppers Lane because a better tenant, Cook County, had expressed interest in opening a health clinic in the anchor space.

While Lane was arranging the Continental Plaza refinancing, NIRT was moving for summary judgment against Lane in the Texas lawsuit. On February 25, 1994, the Texas state court entered judgment against Lane in the amount of approximately $2,400,000.00, which represented $1,500,000.00 in unpaid principal and $900,000.00 in unpaid interest. In addition to this debt, Lane also had an obligation to repay Reverend Daniels the $240,000.00 that Lane tendered to ANB as Shoppers Lane's security deposit on the anchor tenant space.

On December 16, 1994, Lane refinanced other existing loans with the South Shore Bank of Chicago ("South Shore"). On the original loans, South Shore held as collateral a $100,000.00 CD. Under the refinancing, South Shore would return the $100,000.00 CD to Lane, and accept in its stead Lane's interest in an office park in Springfield, Illinois known as Springfield Office Partnership.

7

Springfield Office Partnership had a value of approximately $500,000.00. South Shore and Lane agreed that South Shore could liquidate Springfield Office Partnership, and South Shore would retain half of the proceeds as collateral and tender the other half to Lane.

The South Shore refinancing loans consisted of $350,000.00 that was to go to LSM; $165,744.39 that was to go to an entity called Urban Services and Development, Inc.; and another $100,000.00 that was also to go to Urban Services and Development, Inc. With each of these transactions, Lane tendered to South Shore Bank a Guaranty stating that he was not in default on any obligation that would affect his performance of his guarantee, and that there was no litigation pending against him that could adversely affect his performance of his guarantee. These representations were false because Lane did not disclose to South Shore the Texas state court judgment of $2,400,000.00, and related collection proceedings.

Prior to and contemporaneously with Lane's transactions with South Shore, he was also in negotiations with NIRT concerning the Texas Casa Bonita judgment. The Government claimed that Lane had promised his interest in Springfield Office Partnership to NIRT as part of a settlement agreement, but then had pledged Springfield Office Partnership to South Shore as collateral on the refinancing loans. NIRT did not learn of Lane's pledging Springfield Office Partnership to South Shore until South Shore had liquidated the property. At that time, the Government claimed that Lane did not disclose to NIRT that he had received half of the proceeds from the liquidation.

In June of 1996, Lane's Continental Plaza refinancing deal collapsed. At that time, the amount outstanding on ANB's loan was $1,746,000.00. ANB called that amount due from Loyola pursuant to Loyola's agreement to purchase the loan in the event of default. Loyola complied and paid the $1,764,000.00 to ANB.

8

The above described events formed the basis of the charges against Lane. Count I of the Government superceding indictment alleged that on November 1, 1993 Lane tendered to ANB for the purpose of inducing ANB to issue the $1,900,000.00 refinancing loan to CCP the following documents, knowing that the documents contained false representations about the anchor tenant lease at Continental Plaza: (1) the May 7, 1993 lease; (2) the amendment to the May 7, 1993 lease; (3) the Estoppel Certificate signed by Shoppers Lane; (4) the mortgage; and (5) the Collateral Assignment of Leases and Rents, all in violation of 18 U.S.C. § 1344.

Count II of the superceding indictment alleged that on November 1, 1993, Lane violated 18 U.S.C. § 1014 when he knowingly made a false statement to ANB for the purpose of influencing ANB's actions upon the $1,900,000.00 loan to CCP. Specifically, Count II alleged that Lane falsely stated in the Amendment to Lease that the lease as defined therein was in full force and effect, when the lease was a sham and was worthless.

Count III of the superceding indictment alleged that on November 1, 1993, Lane violated 18 U.S.C. § 1014 when he knowingly made a false statement to ANB for the purpose of influencing ANB's actions upon the $1,900,000.00 loan to CCP. The basis for Count III was that Lane falsely stated in the Amendment to Lease that Shoppers Lane Supermarket, Inc. had tendered a security deposit of $240,000.00 when it had not, and that Lane himself had supplied the money in question.

Count IV of the superceding indictment alleged that on November 1, 1993, Lane violated 18 U.S.C. § 1014 when he knowingly made a false statement to ANB for the purpose of influencing ANB's actions upon the $1,900,000.00 loan to CCP. Specifically, Count IV alleged that Lane falsely stated in the Collateral Assignment of Leases and Rents that all leases tendered in connection with

the refinancing of Continental Plaza were in full force and effect, when the purported lease with Shoppers Lane was a sham and was worthless.

Count V of the superceding indictment alleged that on November 1, 1993, Lane violated 18 U.S.C. § 1014 when he knowingly made a false statement to ANB for the purpose of influencing ANB's actions upon the $1,900,000.00 loan to CCP. Count V charged Lane with tendering to ANB the Estoppel Certificate signed by Leonard Muhammad on behalf of Shoppers Lane Supermarket Inc., which falsely stated that the lease with Shoppers Lane Supermarket, Inc. was in full force and effect when the lease was a sham and was worthless.

Count VI of the superceding indictment alleged that on November 1, 1993, Lane violated 18 U.S.C. § 1014 when he knowingly made a false statement to ANB for the purpose of influencing ANB's actions upon the $1,900,000.00 loan to CCP. Count VI alleged that Lane falsely stated in the Guaranty of Payment that: (1) he was not in default under any agreements to which he was a party, when Lane was in fact in default on a guarantee to pay a debt of $1,500,000.00 in principal plus interest relating to the Casa Bonita entities in Texas; and (2) there was no action pending against Lane that could adversely affect his ability to honor the Guaranty of Payment, when in fact there was a collection lawsuit pending against Lane concerning the debt of $1,500,000.00 plus interest from the Casa Bonita loan from NIRT, and that Lane did not disclose this lawsuit to ANB.

Count VII of the superceding indictment alleged that on December 16, 1994, Lane violated 18 U.S.C. § 1014 when he knowingly made a false statement to South Shore Bank for the purpose of influencing South Shore Bank's actions in considering a $350,000.00 loan to LSM. The basis for Count VII was that Lane allegedly tendered to South Shore Bank a Guaranty falsely stating that he was not in default on any obligation that could affect his performance of his guarantee and that there

was no litigation pending against him that could affect the performance of his guarantee, when Lane was subject to the $2,400,000.00 Texas state court judgment and related collection proceedings, which he did not disclose.

Count VIII of the superceding indictment alleged that on December 16, 1994, Lane violated 18 U.S.C. § 1014 when he knowingly made a false statement to South Shore Bank for the purpose of influencing South Shore Bank's actions in considering a $165,744.39 loan to Urban Services and Development, Inc. Specifically, Count VIII alleged that Lane tendered to South Shore Bank a Guaranty falsely stating that Lane was not in default on any obligation that could affect his performance of his guarantee and that there was no litigation pending against him that could affect the performance of his guarantee, when Lane was subject to the $2,400,000.00 Texas state court judgment and related collection proceedings, which he did not disclose.

Count IX of the superceding indictment alleged that on December 16, 1994, Lane violated 18 U.S.C. § 1014 when he knowingly made a false statement to South Shore Bank for the purpose of influencing South Shore Bank's actions in considering a $100,000.00 loan to Urban Services and Development, Inc. Count IX charged Lane with tendering to South Shore Bank a Guaranty falsely stating that he was not in default on any obligation that could affect his performance of his guarantee and that there was no litigation pending against him that could affect the performance of his guarantee, when Lane was subject to the $2,400,000.00 Texas state court judgment and related collection proceedings, which he did not disclose.

Prior to trial, the Government dismissed Count I of the superceding indictment, so that the only charges remaining against Lane were the violations of 18 U.S.C. § 1014 alleged in Counts II-IX of the superceding indictment. The case proceeded to a jury trial, and the jury returned a verdict of

11

guilty as to Counts III, VI, VII, VIII and IX, and reported that they were undecided as to Counts II, IV and V. The court declared a mistrial as to the counts on which the jury was hung, and accepted the guilty verdict on the other counts. To recap, the counts on which Lane was found guilty were: (1) Count III relating to Lane's representation to ANB that Shoppers Lane Supermarket, Inc. had provided a $240,000.00 security deposit, when in fact Lane himself provided that money; (2) Count VI concerning Lane's representation to ANB that he was not in default under any agreements to which he was a party, and there was no action pending against him that could adversely affect his ability to honor his guaranty, when he was actually in default on a guarantee to pay a debt of $1,500,000.00 in principal plus interest relating to the Casa Bonita entities in Texas and there was related collection litigation pending; (3) Counts VII, VIII and IX relating to Lane's statements to South Shore Bank that he was not in default on any obligation that could affect his performance of his guaranty and that there was no litigation pending against him that could affect the performance of his guaranty, when he was subject to the $2,400,000.00 Texas state court judgment and related collection proceedings.

At sentencing, one of the issues was the determination of loss for the purpose of the sentencing guidelines. The Government argued that Lane was responsible for $1,264,000.00 in actual and intended losses to ANB and Loyola, and was also responsible for relevant conduct losses of $500,000.00 arising out of the South Shore refinancing loans. Lane, on the other hand, submitted that the guideline loss was zero and that the guideline range was 0-6 months. The court agreed with the Government's loss calculation, and then granted a one level downward departure, leading to a sentencing range of 30-37 months.

## II.  DISCUSSION

Lane moves the court to order his release pending appeal, and submits three arguments in support of his release: (1) the court erroneously calculated the loss for sentencing purposes, and the correct loss calculation will lead to a guideline range of 0-6 months; (2) the court erroneously admitted evidence proffered by the Government, in violation of Federal Rule of Evidence 404(b); and (3) the court erroneously barred evidence proffered by Lane that would have demonstrated he lacked specific intent.

While considering Lane's arguments, the court reiterates that it considered each Count of the superseding indictment separately in considering all issues that arose at trial.  Cf. Neder v. United States, 119 S. Ct. 1827, 1834-37 (1999).  The court so instructed the jury, and has continued to do so in consideration of the motions at bar.  Cf. id.  The court first addresses the legal standards that frame the analysis, and then addresses each of Lane's arguments.

### A.    Legal Standards:

The Bail Reform Act of 1984, 18 U.S.C. § 3143(b), governs the issue of release pending appeal by a defendant.  Enacted largely to reverse the presumption in favor of bail under the Bail Reform Act of 1966, see United States v. Bilanzich, 771 F.2d 292, 298 (7th Cir.1985), the statute provides that a court may allow a convicted defendant to remain free on bond pending appeal if: (1) the defendant is not likely to flee or pose a danger to the community, (2) the appeal is not for the purpose of delay, and (3) the appeal raises a "substantial question of law or fact" likely to result in reversal, an order for a new trial, a sentence that does not include a term of imprisonment, or a sentence that reduces the term of imprisonment.  United States v. Ashman, 964 F.2d 596, 598 (7th Cir.1992) (citing 18 U.S.C. § 3143(b)); see also United States v. Greenberg, 772 F.2d 340, 341 (7th

Cir.1985).[1]  "The change Congress enacted 'requires an affirmative finding that the chance for reversal is substantial. This gives recognition to the basic principle that a conviction is presumed to be correct.'" Bilanzich, 771 F.2d at 298 (quoting S.Rep. No. 225, 98th Cong., 1st Sess. 27, reprinted in 1984 U.S.Code Cong. & Ad.News 3182, 3210).  Further, § 3143(b) suggests "that harm results not only when someone is imprisoned erroneously, but also when execution of sentence is delayed because of arguments that in the end prove to be without merit." United States v. Shoffner, 791 F.2d 586, 589 (7th Cir.1986).

---

[1]  Verbatim, 18 U.S.C. § 3143(b) states:

(1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or petition for a writ of certiorari, be detained, unless the judicial officer finds--

> (A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

> (B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in--

> (i) reversal,
> (ii) an order for a new trial,
> (iii) a sentence that does not include a term of imprisonment, or
> (iv) a reduced sentence to a term of imprisonment less than the total of time already served plus the expected duration of the appeal process.

If the judicial officer makes such findings, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c) of this title, except that in the circumstance described in subparagraph (B)(iv) of this paragraph, the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence.

(2) The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, be detained.

Here, the first two inquiries to determine whether Lane is entitled to release pending appeal--likelihood of flight and danger to the community, § 3143(b)(1)(A)--are not at issue. Mr. Lane has conducted himself forthrightly throughout these proceedings. Nor is there any indication that Lane's motion is for the purpose of delay. See 18 U.S.C. § 3143(b)(1)(B). The sole contention is whether Lane raises a substantial question of law or fact likely to result in reversal, an order for a new trial, or a reduced sentence. See 18 U.S.C. § 3143(b)(1)(B).

Section 3143(b)(1)(B) places "the burden of showing the merit of the appeal" on the defendant. Bilanzich, 771 F.2d at 298. Under § 3143(b)(1)(B)'s framework, a defendant who is not a danger or flight risk and does not intend delay must satisfy two elements. See Shoffner, 791 F.2d at 588; Bilanzich, 771 F.2d at 298. First, he must show that his appeal presents a "substantial" issue. See Shoffner, 791 F.2d at 588; Bilanzich, 771 F.2d at 298. "An issue is 'substantial'. . . if it presents 'a "close" question or one that very well could be decided the other way.'" United States v. Hattermann, 853 F.2d 555, 557 n. 6 (7th Cir.1988) (quoting Shoffner, 791 F.2d at 589 (quoting in turn United States v. Giancola, 754 F.2d 898, 901 (11th Cir.1985)); see also United States v. Eaken, 995 F.2d 740, 741 (7th Cir.1993). While "[t]his standard does not require the district court to predict the outcome of the appeal[,]" Hattermann, 853 F.2d at 557 n. 6, the court must find "that the appeal could readily go either way, that it is a toss-up or nearly so." Greenberg, 772 F.2d at 341.

If Lane satisfies this first element, he must then demonstrate that the substantial issue will affect the validity of his conviction. See Shoffner, 791 F.2d at 588; Bilanzich, 771 F.2d at 298. At this stage, the court "must determine whether a contrary appellate ruling is likely to require a reversal of the conviction or a new trial." Shoffner, 791 F.2d at 588 (citing Bilanzich, 771 F.2d at 298; United States v. Miller, 753 F.2d 19, 23 (3d Cir.1985)). Thus, Lane must do more than show that

15

an error occurred at trial; he must persuade the court that "the appellate court is more likely than not to reverse the conviction or order a new trial on all counts for which imprisonment has been imposed." Bilanzich, 771 F.2d at 298; see also Morison v. United States, 486 U.S. 1306, 1306-07 (1988) (denying bond application for appeal to Supreme Court where the petitioner had "not shown that his appeal [was] likely to result in reversal with respect to all the counts for which imprisonment was imposed. . . .").

With these principles in mind, the court must "return its attention to its own analysis of these issues at earlier stages of the proceedings[,]" Shoffner, 791 F.2d at 589, and provide a statement of reasons supporting its disposition of Defendant's motion. See Swanquist, 125 F.3d at 575-76. In Swanquist, the Seventh Circuit explained:

> Rule 9(a) [of the Federal Rules of Appellate Procedure] unambiguously requires that the district court "must" provide a statement of "reasons" for a decision regarding release, either in writing or orally on the record. Although the standards for what suffices as a statement of reasons are not subject to rigid definition, we believe that a statement of reasons encompasses more than a mere recitation of the statutory language followed by nothing more than a conclusory statement that the applicable factors have (or have not) been met. See United States v. Fields, 466 F.2d 119, 121 (2d Cir.1972) (reasons must "be stated with particularity"); United States v. Thompson, 452 F.2d 1333, 1336 n. 7 (D.C. Cir.1971) ("A mere parrotting of the provisions of the applicable statute is not an adequate substitute for a full statement of reasons), cert. denied, 405 U.S. 998, 92 S.Ct. 1251, 31 L.Ed.2d 467 (1972). In other words, "a district court's reasons for its decision must be adequately explained; conclusory statements are insufficient." [United States v. Wheeler, 795 F.2d 839, 841 (9th Cir.1986) ] (citations omitted).
> The district court's failure to provide the mandatory statement of reasons has several negative consequences. First, in the absence of a remand, it forces us to undertake a task specifically designated to be completed by the district court. Although we conduct a de novo review of orders granting or denying release pending appeal (United States v. Eaken, 995 F.2d 740, 741 (7th Cir.1993)), it is nevertheless vital to the court of appeals to be apprised of the district court's rationale. See United States v. Stanley, 469 F.2d 576, 581-84 (D.C.Cir.1972). Where we are not provided with an adequate

statement of reasons, we are forced to speculate as to the reasons for the district court's decision. This is unfair to the bail applicant because it hampers his efforts to obtain bail in the court of appeals and because it injects unnecessary delay in the proceedings of the bail motion. See United States v. Affleck, 765 F.2d 944, 954 (10th Cir.1985) (the writing requirement aids the appellate function); Stanley, 469 F.2d at 583-84 ("'[t]he District Judge's reasoning must be delineated both out of fairness to the appellant and as an aid to this court'") (citation omitted). Finally, it stifles the goal of judicial economy by forcing the case to bounce back and forth between the two courts. Judicial economy is particularly important in motions for release, as these motions must be handled expeditiously due to the liberty interest at stake. See Fed.R.App.P. 9(a) and (b).

125 F.3d at 575-76; see also United States v. Hooks, 811 F.2d 391 (7th Cir.1987); United States v. Cordero, 992 F.2d 985, 986 n. 1 (9th Cir.1993); Wheeler, 795 F.2d at 841; United States v. Wong-Alvarez, 779 F.2d 583, 585 (11th Cir.1985).

Thus, the court must review the record in light of Lane's arguments and explain why his motion for release pending appeal is denied. See e.g. United States v. Santos, 65 F. Supp. 2d 802 (N.D. Ill. 1999) (denying a motion for release pending appeal); United States v. Swanquist, 979 F. Supp. 679 (N.D. Ill.1997) (Bucklo, J., denying release after second remand). The court now turns to that task.

## B.    Sentencing:

The sentences for Lane's convictions under 18 U.S.C. § 1014 are governed by United States Sentencing Guidelines Manual § 2F1.1. Section 2F1.1 has a base offense level of 6, with additional increases in level for the amount of loss, and as relevant to this case, a 2 level increase for more than minimal planning. See U.S.S.G. § 2F1.1. At the sentencing hearing, the court determined that Lane was responsible for actual and intended losses of $1,264,000.00 to ANB and Loyola and a relevant conduct loss of $500,000.00 to NIRT, for a total loss of $1,764,000.00. Section 2F1.1 imposes a 12

17

level increase for losses above $1,500,000.00, resulting in a base offense level of 18. With the 2 level increase for more than minimal planning, the guideline range was 33-41 months. The court then found that the $1,764,000.00 overstated the seriousness of Lane's offenses, and granted a 1 level downward departure. With the downward departure, Lane's offense level was 19, mandating a sentencing range of 30-37 months. The court imposed a sentence of 30 months.

Lane's primary argument at the sentencing hearing concerned the court's loss calculation. Lane now re-asserts, with neither factual nor legal development, that the correct loss calculation results in a finding of no loss. With no loss, the base offense level is 6, plus a 2 level increase for more than minimal planning, resulting in a final offense level of 8. At level 8, Lane's guideline range would have been 0-6 months.

In response to Lane's submission, the court reiterates its loss calculation findings below, and finds that Lane fails to present a substantial question of law or fact concerning the loss calculation that would justify release pending appeal under 18 U.S.C. § 3143. The court's analysis entails the actual and intended loss to ANB and Loyola, relevant conduct connected to the South Shore convictions, and the downward departure. The court addresses each of these points in turn.

1. **Actual and Intended Losses:**

The counts on which Lane was convicted all involve making false statements in loan applications. The comment notes to § 2F1.1 instruct that in fraudulent loan application cases, the court is to use for sentencing purposes either the intended loss or the actual loss to the victim, whichever is greater. See United States v. Kipta, 212 F.3d 1049, 1052 (7th Cir. 2000). The actual loss is "the amount of the loan not repaid at the time the offense is discovered, reduced by the amount the lending institution has recovered (or can expect to recover) from any assets pledged to

18

secure the loan." U.S.S.G. § 2F1.1, comment n. 8(b); <u>see also</u> <u>United States v. Saunders</u>, 129 F.3d 925, 931 (7th Cir. 1997) (discussing calculation of loss under the defendant's fraudulent loan application theory); <u>United States v. Morris</u>, 80 F.3d 1151, 1171 (7th Cir. 1996) (analyzing U.S.S.G. § 2F1.1 and noting that actual loss is determined "by subtracting from the face amount of the loan both the amount repaid prior to discovery of the fraud and any amount to be recovered from assets pledged as collateral to secure the loan."); <u>cf.</u> <u>United States v. Watson</u>, 189 F.3d 496, 501 n. 3 (7th Cir. 1999) (dicta noting loss calculation in fraudulent loan application cases).

By contrast, intended loss is the amount of money that the defendant places at risk as a result of the fraudulent loan application. <u>United States v. Lauer</u>, 148 F.3d 766, 768 (7th Cir. 1998); <u>see</u> <u>United States v. Bonnano</u>, 146 F.3d 502, 509-10 (7th Cir. 1998) (holding that intended loss is determined by the risk of loss caused by the fraudulent scheme rather than the probability that the scheme would actually reap the full amount at risk); <u>United States v. Downs</u>, 123 F.3d 637, 643-44 (7th Cir. 1997) (discussing repayment of loans after the fraud is discovered and holding that such payments do not reduce the loss calculation); <u>see also</u> <u>United States v. Stockheimer</u>, 157 F.3d 1082, 1089-90 (7th Cir. 1998) (noting that while the amount at risk is often useful in determining intended loss, the operative concept is simply "intended loss"); <u>United States v. Higgins</u>, 270 F.3d 1070, 1075 (7th Cir. 2001) (noting that intended loss analysis does not turn upon a loss materializing or the economic possibility of loss). In the context of a fraudulent loan application, the intended loss is the portion of the loan that the defendant does not intend to repay, rather than the entire loan amount. <u>Lauer</u>, 148 F.3d at 768.

Applying these principles to the case at bar, the court began the sentencing analysis with the amount of the loans outstanding at the time the fraud was discovered. <u>Kipta</u>, 212 F.3d at 1052;

19

Saunders, 129 F.3d at 931; Morris, 80 F.3d at 1171. That amount was $1,736,000.00, which is what Loyola paid to ANB in June of 1996 pursuant to Loyola's agreement to purchase the Continental Plaza refinancing loan from ANB if the loan went into default. From this amount, the court subtracted the value of any assets pledged to secure the loan. Kipta, 212 F.3d at 1052; Saunders, 129 F.3d at 931; Morris, 80 F.3d at 1171.

The asset in this case was the Continental Plaza property, and there were some issues concerning its value. Loyola donated the property to the City of Chicago, which razed the property and has left it vacant. And, there were unpaid property taxes of $416,000.00 on the land. Initially, the Government submitted that the value of the land was zero, based on Loyola's donation of the land to the City. But, at the sentencing hearing, the Government revised its position and asserted that the proper valuation of the land would be had by taking the assessed value, $880,000.00, and subtracting the amount of the unpaid property taxes, $416,000.00.

Thus, the court calculated the actual and intended loss to ANB and Loyola as the amount of the loan outstanding at the time the fraud was discovered, $1,736,000.00, less the assessed value of Continental Plaza, $888,000.00, plus the amount of unpaid taxes, $416,000.00. The arithmetic leads to an actual and intended loss to ANB and Loyola of $1,264,000.00.

Lane argued that the above loss calculation ignores the realities of the situation. Lane pointed out that ANB did not lose any money because it recovered the unpaid loan amount from Loyola, pursuant to Loyola's agreement to purchase the Continental Plaza refinancing loan if it went into default. Thus, according to Lane, there was no actual loss to ANB. As to Loyola, Lane asserted that Loyola recovered $1,350,000.00 from Cole Taylor Bank in November 1993 under the separate agreement between them. Lane further claimed that Loyola earned substantial income from that

$1,350,000.00, so that by the time Loyola paid $1,736,000.00 to ANB, Loyola came out with a profit of approximately $69,000.00. The thrust of Lane's argument was that there was no net loss to either ANB or Loyola, and therefore, the loss calculation should be zero.

The court rejected Lane's position. The Seventh Circuit instructs that the time to take into account the economic realities of the defendant's conduct is in considering a downward departure, rather than in loss calculation. See Stockheimer, 157 F.3d at 1089; Bonnano, 146 F.3d at 510; Downs, 123 F.3d at 643-44. More fundamentally, Lane is not entitled to benefit from the fact that ANB and Loyola limited their exposure through agreements with persons other than Lane, thereby mitigating their losses. "The fact that the victims have been able to recover . . . their loss after the discovery of the fraud does not diminish [the defendant's] culpability and responsibility for purposes of sentencing." United States v. Janusz, 135 F.3d 1319, 1324 (10th Cir. 1998); see also Downs, 123 F.3d at 643-44 (rejecting the argument that loss calculation should be reduced by post-discovery restitution); United States v. Wilson, 980 F.2d 259, 261-62 (4th Cir. 1992) (holding that loss under § 2F1.1 includes amounts that the victim ultimately recovers from a third party guarantor). Loss calculation analysis with its graduated punishment scheme properly focuses on the objective financial risk to victims caused by the defendant's criminal conduct, without consideration of third party guarantees or that the full exposure of risk did not come to pass. See Higgins, 270 F.3d at 1075; Stockheimer, 157 F.3d at 1089; Bonnano, 146 F.3d at 510; Janusz, 135 F.3d at 1324; Downs, 123 F.3d at 643-44; Wilson, 980 F.2d at 261-62; United States v. Schneider, 930 F.2d 555, 558-59 (7th Cir. 1991). That a victim of a fraudulent loan application was able to mitigate its losses through the good faith performance of a third party guarantor is an event that does not inure to the benefit of the perpetrator of the fraud. To that end, the defendant is not entitled to a lower loss calculation

because the victim of the defendant's fraud lessened its "bottom line" losses through third party guarantees or other agreements that do not involve the defendant.

This conclusion is borne out by the separate risks and fortuities involved in third party guarantees. Again, the focus of loss analysis is on the risk created by the fraudulent loan application. Lauer, 148 F.3d at 768; see also United States v. Anderson, 188 F.3d 886, 889-90 (7th Cir. 1999) (discussing new and independent risks created by refinancing intended to rescue an original loan). To further illustrate, suppose that Loyola had not honored its obligation to ANB. ANB accepted that risk, however slight it might be. If Loyola did not pay its guaranty, ANB would be out of pocket $1,736,000.00, and no one could seriously dispute that its actual loss was that amount. Why should Lane's loss calculation change because Loyola honored its obligation after Lane's fraud was complete? The amount of money risked by Lane's fraud was the same, regardless of Loyola's performance on its guarantee. See e.g. Schneider, 930 F.2d at 559 (noting that the crime is complete at the time of the fraud, and that what happens later does not affect the loss calculation). By determining loss as the amount at risk, the loss figure remains static, but the sentence may be adjusted through a downward departure if the full risk of loss did not come to pass, or the victim has otherwise been compensated. That is the scheme contemplated by the sentencing guidelines and applied by the courts. See Higgins, 270 F.3d at 1075; Stockheimer, 157 F.3d at 1089; Bonnano, 146 F.3d at 510; Janusz, 135 F.3d at 1324; Downs, 123 F.3d at 643-44; United States v. Lucas, 99 F.3d 1290, 1299 (6th Cir. 1996); United States v. Wolfe, 71 F.3d 611, 616-19 (6th Cir. 1995); Wilson, 980 F.2d at 261-62; Schneider, 930 F.2d at 558-59.

This principle is well illustrated in the Fourth Circuit's opinion in Wilson, 980 F.2d at 261-62. In that case, Everett Wilson obtained a loan from a bank for the purpose of opening a furniture

business. Id. at 260. The lender required as security a third party guaranty and a security interest in the assets of the furniture business. Id. The lender also required Wilson to submit monthly financial statements so it could keep track of the financial health of the business. Id. Eventually, the furniture business began to fail. While Wilson's initial loan application had been truthful, he later submitted false financial statements to the lender. Id. at 260-61. When the fraud was discovered, the third party guarantor paid a portion of the outstanding debt as part of a settlement agreement. Id.

At issue was whether the loss calculation would include the amount the lender recovered from the third party guarantor. Wilson, 980 F.2d at 261. The Fourth Circuit framed the issue as "whether the district court erred in not reducing the amount of loss by the $125,000 paid by . . . the guarantor." Id. The Fourth Circuit held that amounts paid by third parties are not to be deducted from the loss calculation. Id. at 261-62. The Court analogized such payments to post discovery restitution, which is not deducted from the loss calculation. Id.

Decisions from other Circuits are in accord that losses should not be reduced by amounts that are recovered by the actions of third parties. See e.g. Janusz, 135 F.3d at 1324 (holding that amounts recovered by fraud victims may count towards restitution, but are not subtracted from the loss calculation); Wolfe, 71 F.3d at 616-19 (perpetrator of Ponzi scheme not entitled to reduce losses by amounts expected to be recovered by Bankruptcy trustee); Lucas, 99 F.3d at 1299 (discussing Wolfe and reiterating that recovery of fraudulently obtained money after the fraud is discovered cannot be used to reduce the amount of loss).

And, what Lane calls Loyola's "recovery" is nothing of the sort. Loyola paid ANB $1,736,000.00 in June of 1996, after the fraud was discovered. Since that time, Loyola has not recovered any funds from any source. The money that Lane asserts is Loyola's recovery is the

$1,350,000.00 that Loyola received from Cole Taylor in November of 1993, pursuant to the Loyola's guaranty on the *original loan* for Continental Plaza. But for the collapse of the Continental Plaza refinancing loan, Loyola would not have had to pay out $1,736,000.00 to ANB. It is thus specious for Lane to assert that Loyola has recovered its losses on the refinancing loan. Section 2F1.1 of the sentencing guidelines would be rendered illusory by the acceptance of Lane's argument.

Lane made much of the fact that Loyola maintained that it did not lose money in the various financing schemes connected to Continental Plaza. Both Loyola and Lane said that after all was said and done, Loyola came out with approximately $69,000.00 in profit. This amount represents what Loyola earned on the $1,350,000.00 it received from Cole Taylor in November 1993, which accrued until June 1996 when Loyola paid $1,736,000.00 to ANB. The court flatly rejected the argument that there was no loss Loyola. The court reiterates that rejection here. Loyola was indeed a victim in this case, both because it was unaware of Lane's misrepresentations in seeking the Continental Plaza refinancing, and because it paid out $1,736,000.00. See e.g. United States v. Biesiadecki, 933 F.2d 539, 544 (7th Cir. 1991) (affirming a district court's decision to bar evidence that certain victims of a mail fraud scheme did not subjectively perceive themselves as having been defrauded); United States v. Bryza, 522 F.2d 414, 422 (7th Cir. 1975) (noting that the court must analyze intent in a mail fraud case based on the defendant's actions, not the reaction of the victims); cf. United States v Seward, 272 F.3d 831, 840-41 (7th Cir. 2001) (discussing a vulnerable victim sentencing enhancement and noting that a deceased's siblings could be considered victims of fraud, even though the decedent's estate was the victim in the first instance). Loyola's subjective position that it profited from its dealings with Lane is of no moment, particularly where Loyola's profit came from

its own foresight to prepare for the possibility that Continental Plaza might fail, rather than any action on the part of Lane.

## 2. Relevant Conduct:

The court's task under § 2F1.1 is to determine the amount of loss attributable to the defendant's criminal conduct, including the loss attributable to the offense of conviction and any relevant conduct under U.S.S.G. § 1B1.3. See United States v. Sykes, 7 F.3d 1331, 1335-36 (7th Cir. 1993); United States v. Sheahan, 31 F.3d 595, 600 (8th Cir. 1994). "Relevant conduct is defined [inter alia] as all acts and omissions 'that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" Sheahan, 31 F.3d at 599 (quoting U.S.S.G. § 1B1.3(a)(2), emphasis omitted).

Here, the court found that Lane was responsible for an additional $500,000.00 in losses to NIRT as relevant conduct to the South Shore convictions (Counts VII-IX). Lane was convicted of making false statements to South Shore in connection with refinancing three loans with that institution. Specifically, Lane failed to disclose to South Shore that the Texas state court had entered a $2,400,000.00 judgment against him, and that NIRT was attempting to collect on that judgment. At the time that Lane was engaged in the refinancing of loans with South Shore, NIRT was seeking to collect on its judgment, and had been in settlement discussions with him. Lane had two assets of substantial value: (1) his interest in the Springfield Office Partnership worth approximately $500,000.00 that NIRT was looking towards to partially satisfy its judgment; and (2) a $100,000.00 CD that South Shore held as collateral on the original loans, of which NIRT was unaware.

At trial, the Government presented evidence that Lane schemed to shield his interest in Springfield Office Partnership from NIRT by pledging that asset to South Shore as collateral for the

refinanced loans, without disclosing the NIRT judgment to South Shore. Lane and South Shore agreed that South Shore would liquidate the Springfield Office Partnership. South Shore would retain half of the proceeds from the liquidation as collateral on the refinanced loans, and distribute half of the proceeds to Lane. Another aspect of the refinancing was that South Shore would return to Lane the $100,000.00 CD that South Shore held as collateral on the original loan. The net effect to South Shore was that it increased its collateral by $150,000.00. But, South Shore agreed to this transaction without knowing that Lane had the $2,400,000.00 NIRT judgment against him, and that NIRT was looking to the Springfield Office Partnership as an asset from which it could collect part of that judgment.

The court found that it should construe the ensuing loss to NIRT of the Springfield Office Partnership as relevant conduct to the South Shore convictions. The evidence demonstrated that Lane shielded Springfield Office Partnership from NIRT, which was part and parcel of his offenses of conviction concerning South Shore. Lane's actions as to both South Shore and NIRT involved a common purpose, common actors, and a similar modus operandi. The two schemes - to defraud NIRT, and to misrepresent debts to South Shore - were carried out at the same time, in the same manner, and in the same transactions. South Shore accepted collateral that was being sought after by NIRT, of whom South Shore was unaware. Lane's actions placed both South Shore and NIRT at risk, as neither of them knew about the other, and they both sought Lane's interest in the Springfield Office Partnership. Accordingly, the court found that Lane's actions in hiding assets from NIRT was relevant conduct to his convictions on the South Shore counts. The loss to NIRT was the value of the Springfield Office Partnership, $500,000.00.

### 3. Downward Departure:

At this point, the court had determined that Lane was responsible for $1,764,000.00 in losses. This figure represents the actual and intended losses to ANB and Loyola of $1,264,000.00, and the $500,000.00 relevant conduct loss to NIRT. With the increase for more than minimal planning and Lane's criminal history category of I, the sentencing range was 33-41 months. Lane moved for a downward departure arguing: (1) that the economic realities of the crimes were such that the court's calculation of loss overstated the seriousness of the offenses; (2) Lane's misrepresentations were not made for the purpose of absconding with the proceeds of a fraudulently obtained loan; and (3) Lane's history of community involvement and community support warranted a lower sentence. Lane sought a significant departure of seven or eight levels. The Government agreed that the final tally of losses overstated the seriousness of Lane's offense, and agreed to a one level downward departure. The court granted the motion, and granted a one level downward departure.

The court has discretion to grant a downward departure, particularly where the sentencing guidelines encourage a specific factor as being a basis for a departure from the guideline range. See United States v. Corry, 206 F.3d 748, 750 (7th Cir. 2000) (discussing Koon v. United States, 518 U.S. 81, 95-96 (1996)); see also United States v. Jaderany, 221 F.3d 989, 994-96 (7th Cir. 2000) (also analyzing Koon) The comments under U.S.S.G. § 2F1.1 specifically mention that in fraudulent loan application cases, the calculated loss may seriously overstate or understate the seriousness of the defendant's conduct, warranting an accompanying departure from the guideline range. This is consistent with the case law, discussed extensively above, that downward departure is the time to take into account the economic realities of a fraudulent loan application. See Higgins, 270 F.3d at 1075; Stockheimer, 157 F.3d at 1089; Bonnano, 146 F.3d at 510; Janusz, 135 F.3d at

27

1324; Downs, 123 F.3d at 643-44; Lucas, 99 F.3d at 1299; Wolfe, 71 F.3d at 616-19; Wilson, 980 F.2d at 261-62; Schneider, 930 F.2d at 558-59.

In this case, both parties agreed that the calculated loss overstated the seriousness of Lane's offenses. The question was by how much. Lane argued again that the reality of the situation was that all victims of Lane's fraud had been made whole. Specifically, Lane argued: (1) ANB recovered its loss in full from Loyola; (2) Loyola had the use of $1,350,000.00 for approximately two and half years, during which time the money grew, so that by the time Loyola honored its guarantee on the refinancing loan, Loyola had a surplus; and (3) NIRT eventually settled its case against Lane. Lane argued that these facts warranted a significant downward departure.

When considering a downward departure the court must make specific factual findings and tie the departure to those facts. See Jaderany, 221 F.3d at 994-96. In this case, the court concluded that a loss figure representing the seriousness of Lane's crimes and its economic impact on the victims would be had by examining the victim's out of pocket losses. The court arrived at a figure of $884,000.00. This figure represents the $500,000.00 relevant conduct loss to NIRT and the difference between what Loyola received in 1993 from Cole Taylor and what Loyola paid out to ANB in 1996, $384,000.00[2], without considering the income that Loyola earned on the money in the interim.

Recall that Loyola was bound under the original loan for Continental Plaza to act as a third party guarantor to Cole Taylor. When Cole Taylor filed its suit, Loyola agreed to pay Cole Taylor

---

[2]The $384,000.00 figure discussed at the sentencing hearing is an arithmetic error. Cole Taylor paid Loyola $1,350,000.00 in 1993, and Loyola paid ANB $1,736,000.00 in 1996. The difference between them is $386,000.00, not $384,000.00. This $2,000.00 error does not affect the ultimate sentencing range.

$1,700,000.00, and Cole Taylor agreed to repay Loyola 90% of whatever Cole Taylor could collect from other sources. When the refinancing deal was finalized in 1993, Cole Taylor received $1,450,000.00 as partial payment, and re-paid Loyola $1,350,000.00. Thus, Loyola was able to recover a substantial portion of its original third party guaranty, which may not have occurred if the refinancing had not gone through. When the refinancing deal collapsed and Loyola honored its second third party guaranty on Continental Plaza, it paid $1,736,000.00 to ANB. The difference between the amount received from Cole Taylor in 1993, $1,350,000.00 and the amount paid to ANB in 1996, $1,736,000.00 is $386,000.00, and is a fair representation of the seriousness of Lane's crimes as they relate to Loyola. Add to that the relevant conduct amount concerning NIRT, $500,000.00, and the court arrived at a final figure of $884,000.00. This figure accurately represents both the seriousness of Lane's offenses and their effect on the victims.

Lane's other arguments were also without merit. Similar to the court's rejection of Lane's zero loss calculation, the court found that Lane is not entitled to benefit from the fact that Loyola invested the $1,350,000.00 profitably. Lane's argument to the contrary rests on fortuities that could just as easily go to his detriment. The court would not penalize Lane if Loyola had made poor business choices with that money, so that it had lessened in value by the time that Loyola paid ANB. An equitable resolution of this issue is to freeze the value of Loyola's recovery of its original guaranty at $1,350,000.00, and consider the difference between that amount and what Loyola paid ANB, $1,736,000.00.

Finally, the court was fully aware of Lane's well-wishers and outpouring of support from some quarters. Lane's counsel argued eloquently of his client's community involvement. Generally, the court is to consider such factors within the guideline range, rather than in determining what the

29

range shall be. After full consideration of all factors, the court imposed the low end of the guideline range.

### 4. Conclusion:

To recap, § 2F1.1 imposes a base offense level of 6. The court determined that Lane was responsible for total losses, including relevant conduct, of $1,764,000.00, increasing the base offense level to 18. The court then added a 2 level increase for more than minimal planning, and granted a 1 level downward departure because the court's loss calculation overstated the seriousness of Lane's offense. The final offense level was 19, with a sentencing range of 30-37 months. The court imposed a sentence of 30 months.

Lane offers nothing to demonstrate that there is a substantial question of law or fact concerning his sentence, although it is his burden to do so. 18 U.S.C. § 3143(b)(1)(B); Bilanzich, 771 F.2d at 298. Lane's sentencing argument in his motion for release pending appeal is limited to one page of his brief, and consists of unsupported conclusions that the correct loss calculation is zero. As the court addressed above, the arguments Lane presented at the sentencing hearing had no basis in either fact or law. The loss calculation depends on the defendant's conduct, not the victim's recovery of losses from third parties. Lane was properly held accountable for relevant conduct losses to NIRT, as those losses were part and parcel of his misrepresentations to South Shore. Finally, the one level downward departure represents an accurate measure of both the seriousness of Lane's offenses and the effect on his victims. For the foregoing reasons, the court finds that Lane fails to present a substantial question of fact or law concerning his sentence that would warrant release pending appeal.

## C. The Court's Evidentiary Rulings:

"A district court's evidentiary rulings are matters within the court's discretion; [an appellate court] will overturn them only when the [district] court has abused that discretion." United States v. Heath, 188 F.3d 916, 920 (7th Cir. 1999); see also United States v. Mancillas, 183 F.3d 682, 705 (7th Cir. 1999); United States v. McCulley, 178 F.3d 872, 875 (7th Cir. 1999). "A court abuses its discretion in admitting evidence only when no reasonable person could agree with its rulings." United States v. Amerson, 185 F.3d 676, 681 (7th Cir. 1999) (internal quotation marks and citations omitted). The Federal Rules of Evidence are essentially rules of inclusion, see United States v. Thomas, 987 F.2d 697, 706 (11th Cir. 1993) ("the Federal Rules of Evidence generally favor the inclusion rather than the exclusion of evidence."), with an end toward attaining the truth.

Further, an appellate court "afford[s] *great deference* to the district court's judgment." McCulley, 178 F.3d at 875 (emphasis added) (citing United States v. Shorter, 54 F.3d 1248, 1260 (7th Cir. 1995); United States v. Glecier, 923 F.2d 496, 503 (7th Cir. 1991)). "The district court's determination of the admissibility of evidence is treated with great deference because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context of the entire proceeding." United States v. Vaughn, 267 F.3d 653, 658 (7th Cir. 2001) (quoting United States v. Denberg, 212 F.3d 987, 992 (7th Cir 2000) (internal quotations omitted)). The Seventh Circuit has described the expanse of this deference, stating that "appellants who challenge evidentiary rulings of the district court are like rich men who wish to enter the Kingdom: their prospects compare with those of camels who wish to pass through the eye of the needle." United States v. Coleman, 179 F.3d 1056, 1061(7th Cir. 1999) (quoting United States v. Emenogha, 1 F.3d 473, 477 (7th Cir. 1993)). The appellate court, however, will reverse the district court's determination when the evidentiary ruling is "fundamentally wrong." Council 31, Amer. Fed. of State, County & Mun. Employees v. Doherty, 169 F.3d 1068, 1074 (7th Cir. 1999) (quoting Williams v. Chicago Bd. of Educ., 155 F.3d 853, 857 (7th Cir. 1998)); see also Fed. R. Evid. 103(a)

("Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . .").

### 1.   Admissible Extrinsic Act Evidence:

All five of the counts upon which Lane was convicted require that he knowingly made false statements for the purpose of influencing a financial institution in violation of 18 U.S.C. § 1014. The Government used specific documents and testimonial evidence to show that the financial statements that Lane gave to ANB and South Shore were false. That information was crucial to the Government's case-in-chief, i.e. showing that Lane violated §1014.

Lane now asserts that the court committed reversible error in admitting certain extrinsic act evidence. The court allowed the Government to present evidence of specific documents relating to Lane's indebtedness as well as the testimony of seven witnesses about the debts Lane owed them and his promises to pay. Lane contends that this information was highly prejudicial and inadmissible under the balancing test of Rule 404(b). Lane claims that this information unfairly prejudiced him, because he was not being charged with any of the conduct introduced and that it was not necessary to help explain those offenses that he was being charged. The court, after extensive briefing, oral arguments, and over Lane's objections admitted the Government's evidence, finding that the evidence was admissible under Rule 404(b), Rule 403, and as "inextricably related" to the charged crimes. The court now is asked to review the same material again to determine if Lane should be released on bond. Lane's arguments are without merit.

### a.   404(b) Evidence:

The Government sought introduction of the evidence to prove Lane's motive, intent, and knowledge of the fraud he was committing. Rule 404(b) states in relevant part:

> (b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed. R. Evid. 404(b).

"Under Rule 404(b), evidence of prior convictions or of other misconduct is not admissible to show that a defendant has a propensity to commit crime and that he acted in conformity with that propensity on the occasion in question." United States v. Best, 250 F.3d 1084, 1090 (7th Cir. 2001); see United States v. Wash, 231 F.3d 366, 370 (7th Cir. 2001); United States v. Lewis, 110 F.3d 417, 419 (7th Cir. 1997). Such evidence "may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, or identity." Wash, 231 F.3d at 370; United States v. Lewis, 110 F.3d 417, 419 (7th Cir. 1997).

When attempting to determine whether evidence is admissible under 404(b) the court must use a four part test. First, the evidence must be directed toward establishing a matter in issue other than the defendant's propensity to commit the act charged. United States v. Montani, 204 F.3d 761, 768 (7th Cir. 2000); United States v. Hudson, 884 F.2d 1016, 1018 (7th Cir. 1989). Second, the other act must be similar enough and close enough in time to be relevant to the matter in issue. United States v. Green, 258 F.3d 683, 694 (7th Cir. 2001); United States v. Ruiz, 178 F.3d 877, 880 (7th Cir. 1999); United States v. Shackleford, 738 F.2d 776, 779 (7th Cir. 1984). Third, the evidence must be "sufficient . . . to support a finding by the jury that the defendant committed the similar act." United States v. Asher, 178 F.3d 486, 492 (7th Cir. 1999); United States v. Cunningham, 103 F.3d 553, 556-7 (7th Cir. 1996); Huddleston v. United States, 485 U.S. 681, 686 (1988). Finally, the proponent of the evidence must show that the probative value of the evidence is not substantially

outweighed by its prejudicial effect. Shackleford, 738 F.2d at 779. The court addresses each of these below.

First the evidence was directed towards Lane's knowledge, willfulness, and intent to make fraudulent statements to financial institutions for the purpose of influencing their actions, in violation of §1014. The very issue that was in contention was clarified by the evidence that was admitted. The evidence helped to show that the financial statements that Lane provided to ANB and South Shore were indeed false or lacking pertinent financial information. Lane owed over three million dollars to various institutions,[3] some of which had sought legal action against him to recover their funds. At the same time, Lane was making disclosures to the banks about his ability to repay their loans. Although Lane did disclose to South Shore two of the outstanding loans, he failed to disclose the approximately $2.5 million that he also owed, and he failed to disclose any of his debt information to ANB.

This information was not used to show Lane's propensity to commit financial fraud. Rather, it demonstrated Lane's intent to commit the fraud and the reasons he committed the fraud. Lane was charged with specific intent crimes, that is, making false statements to a financial institution for the purpose of influencing its action on a loan. The Seventh Circuit has "repeatedly held that it is proper to use other acts evidence to establish intent where the defendant is charged with a specific intent crime." United States v. Vaughn, 267 F.3d 653, 659 (7th Cir. 2001) (citing United States v.

---

[3]   Over the period in time in which Lane was trying to gain refinancing, Lane owed approximately $3,100,000.00 to the following institutions:

| | |
|---|---|
| NIRT (Casa Bonita) - | $2.4 million approximately |
| J & R Dairy (trade creditor) - | $225,000 approximately |
| Central Grocers (trade creditor) - | $477,000 approximately |
| American National Bank (personal loan) - | $35,000 approximately |
| Mid City National Bank (personal loan) - | $30,000 approximately |

Denberg, 212 F.3d 987, 993 (7th Cir. 2000); United States v. Lewis, 110 F.3d 417, 420 (7th Cir. 1997); United States v. Long, 86 F.3d 81, 84 (7th Cir. 1996); United States v. Harvey, 959 F.2d 1371, 1374 (7th Cir. 1992); United States v. Chaimson, 760 F.2d 798, 808 (7th Cir. 1985)).

The Government is allowed to present this evidence because "intent is a required element of [a specific intent crime], and the Government must prove each and every element of the crime charged beyond a reasonable doubt." Chaimson, 760 F.2d at 806. Therefore, the defendant's intent is necessarily at issue in any prosecution for a specific intent crime. See United States v. Liefer, 778 F.2d 1236, 1242-43 (7th Cir. 1985).

The Government must prove every element of the crime even if the defendant is not contesting it. United States v. Jones, 248 F.3d 671, 675 (7th Cir. 2001); see also Estelle v. McGuire, 502 U.S. 62, 69 (1991) ("The prosecution's burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense."); Mathews v. United States, 485 U.S. 58, 64-65 (1988) ("A simple plea of not guilty puts the prosecution to its proof as to all elements of the crime charged."). The mere fact that a defendant claims that there was no intent to commit the act or that he merely made a mistake does not prevent the Government from being able to admit the extrinsic act evidence to show the defendant's knowledge, willfulness, and intent to make fraudulent statements to a financial institution for the purpose of causing them to act on it. See e.g., United States v. Brown, 34 F.3d 569, 573 (7th Cir. 1994) (ruling that "a defendant cannot keep 404(b) evidence out of his case by denying all charges"); United States v. Mazzanti, 888 F.2d 1165, 1171 (7th Cir. 1989) (holding that evidence of other acts was admissible under Rule 404(b) to show the defendant's intent in a prosecution for a specific intent crime in order to overcome the defendant's blanket denial of wrongdoing which "was meant to

negate any evidence of intent"); United States v. Monzon, 869 F.2d 338, 344 (7th Cir. 1989) (holding other act evidence admissible, and ruling that "in cases involving specific intent crimes, intent is automatically in issue, regardless of whether the Defendant has made intent an issue in the case"); United States v. Harrod, 856 F.2d 996, 1001 (7th Cir. 1988) (holding other act evidence admissible, and ruling that "the [defendant] cannot remove intent as an element of the Government's proof by merely raising as a defense that he did not participate in the crime charged") (citation and internal quotation omitted); United States v. Draiman, 784 F.2d 248, 254 (7th Cir. 1986); Liefer, 778 F.2d at 1242-43; Chaimson, 760 F.2d at 805-06; United States v. Weidman, 572 F.2d 1199, 1202-03 (7th Cir. 1978).

Second, the acts that the Government was seeking to introduce into evidence are very similar to, and occurred in connection with, the charged offenses. The evidence showed the jury what false statements Lane made, and their importance to the claimed actions. All of the evidence that the Government sought to introduce occurred at the same time or was directly related to the charged and convicted counts.

Third, the evidence was more than sufficient to support a finding by the jury that Lane committed the similar acts. The evidence showed that Lane knowingly committed the same act over and over again in an attempt to save his failing business ventures. Lane repeatedly failed to disclose the true nature of his financial condition to probable lenders. The evidence supported the jury's findings that Lane knowingly and willfully left out information about his debts and liabilities to induce others to act.

Finally, part four of the 404(b) test, also known as the "balancing test," looks at the probative value of the evidence to see if it is substantially outweighed by its prejudicial effect. This final part

36

of the Rule 404(b) test is actually required under Rule 403. Rule 403 states that, although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence. Fed. R. Evid. 403.

The Government's evidence gave a clear indication as to what Lane's financial situation was, and how he misrepresented it. Lane had over three million dollars in outstanding debt, but represented only a fraction of that to the financial institutions. Any claims of innocent mistake or oversight that Lane might have made became completely preposterous based on the sheer volume of debt that he had acquired. Although the evidence was harmful to Lane, it was not unfairly prejudicial within the meaning of Rule 403 or 404(b). The probative value of the evidence clearly outweighed any prejudicial effect of its admittance.

The court's ruling that allowed the Government to present both the specific documents and the testimony of seven witnesses concerning Lane's indebtedness and his promises to repay was correct. The evidence was admissible under Rules 403 and 404(b). Lane's motion for release pending appeal is without merit on this issue.

And, as discussed below, the evidence objected to is intricately related with the case at hand and can therefore be analyzed under the "intricately related" doctrine, without reference to 404(b) factors, but with a careful 403 analysis.

**b.  Intricately Related Doctrine:**

In order to be properly admitted under the doctrine of "inextricably related," the evidence must provide the jury with a complete story of the crime on trial. United States v. Lahey, 55 F.3d 1289, 1297 (7th Cir. 1995) (citing Roberts, 933 F.2d at 520 (7th Cir. 1991)). Thus, when a case

would be riddled with holes resulting in a "chronological or conceptual void" in the crime without the inextricably related evidence, it is admissible without having to go through the rigors of 404(b)'s four part test. United States v. Bogan, 267 F.3d 614, 621-2 (7th Cir. 2001). Inextricably related evidence does not have to satisfy 404(b), but must satisfy the balancing test of Rule 403. United States v. Harris, 271 F.3d 690, 705 (7th Cir. 2001); Bogan, 267 F.3d at, 622 (7th Cir. 2001); Johnson, 248 F.3d at 665; United States v. Andreas, 216 F.3d 645, 665 (7th Cir. 2000); United States v. Ryan, 213 F.3d 347, 350 (7th Cir. 2000); United States v. Hughes, 213 F.3d 323, 329 (7th Cir. 2000); United States v. Ward, 211 F.3d 356, 362 (7th Cir. 2000); United States v. Gibson, 170 F.3d 673, 680 & 682(7th Cir. 1999); United States v. Van Dreel, 155 F.3d 902, 906 (7th Cir. 1998); United States v. Cusimano, 148 F.3d 824, 829 (7th Cir. 1998); United States v. Johnson, 137 F.3d 970, 974 (7th Cir. 1998); United States v. Richardson, 130 F.3d 765, 777 (7th Cir. 1997); United States v. Murray, 89 F.3d 459, 462 (7th Cir. 1996); United States v. Akinrinade, 61 F.3d 1279, 1286 (7th Cir. 1995); United States v. Hubbard, 61 F.3d 1261, 1270-1 (7th Cir. 1995); United States v. Spaeni, 60 F.3d 313, 316 (7th Cir. 1995); United States v. Saulter, 60 F.3d 270, 276 (7th Cir. 1995); United States v. Mohammad, 53 F.3d 1426, 1432 (7th Cir. 1995); United States v. Ramirez, 45 F.3d 1096, 1102 (7th Cir. 1995); United States v. Hargrove, 929 F.2d 316, 320 (7th Cir. 1991); United States v. Elder, 16 F.3d 733, 737 (7th Cir. 1994). Evidence may be intricately related if it helps complete the story of the charged crime or tends to prove any element of the crime. See United States v. Ryan, 213 F.3d 347, 350 (7th Cir. 2000); United States v. Ramirez, 45 F.3d 1096, 1102 (7th Cir. 1995).

The question that the court must ask is whether the evidence is properly admitted to provide the jury with a "complete story of the crime [on] trial," Roberts, 933 F.2d at 520 (internal quotations omitted, brackets in the original), whether its absence would create a "chronological or conceptual void" in the story of the crime, United States v. Hattaway, 740 F.2d 1419, 1424-25 (7th Cir. 1984);

United States v. Adamo, 882 F.2d 1218, 1234 (7th Cir. 1989), or whether it is "so blended or connected" that it incidentally involves, explains the circumstances surrounding, or tends to prove any element of, the charged crime. United States v. Bucey, 876 F.2d 1297, 1315 (7th Cir. 1987). Thus, cases applying the "intricately related" doctrine have recognized that evidence concerning the chronological unfolding of events that led to an indictment, or other circumstances surrounding the crime, is not evidence of "other acts" within the meaning of Rule 404(b). See United States v. Zarnes, 33 F.3d 1454, 1469 (7th Cir. 1994) (evidence of drug transactions completed before conspiracy began was intricately related to conspiracy case because it showed how the relationship between the parties began and blossomed into the charged conspiracy); United States v. Diaz, 994 F.2d 393, 395 (7th Cir. 1993) (same); United States v. Hilgeford, 7 F.3d 1340, 1345-46 (7th Cir. 1993) (evidence of defendant's litigation concerning ownership of farm lost in foreclosure was intricately related to subsequent prosecution for filing false tax returns where knowledge of nonownership was at issue); Hargrove, 929 F.2d at 320 (evidence concerning pager, cash, and drug reaction of dog when car was searched was intricately related to conspiracy, even where defendant was arrested 10 months after end of charged conspiracy); Roberts, 933 F.2d at 519-20 (evidence that police saw defendant throw weapon away during attempted getaway from foiled drugstore hold-up was intricately related to prosecution for armed bank robbery and illegal possession of a firearm two days earlier).

In this instance, the evidence that the Government sought to introduce was intricately related to Lane's criminal activity. The evidence provided the jury with the complete story of Lane's fraud. The evidence demonstrated Lane's financial situation, what he owed, who he owed, and how much he owed. This evidence not only completed the story, but was part of the driving force behind the

story and helped fill in certain "conceptual voids" in the case. Specifically, it showed that Lane's financial statements were not complete by demonstrating that Lane failed to disclose over $2.5 million in debt in order to obtain future financing and help his failing business ventures. Furthermore, the evidence also helped to show Lane's intent. It provided the financial backdrop for why Lane failed to provide a full disclosure of his debt, which was so that he might receive future loans. By failing to disclose all of his debt he hoped to be able to induce future financial institutions to refinance or lend new money, which was the basis for the criminal charges against him.

The extrinsic act evidence that the Government proffered satisfied all of the possible categories for it to qualify under the "intricately related" doctrine. As previously stated, the evidence also satisfied the "balancing test" requirements of Rule 403. The evidence was not unfairly prejudicial, misleading, or confusing of the issues. The evidence helped show what Lane did and why he did it. The extrinsic act evidence was therefore properly admitted during the trial. The court, using its full discretion properly admitted the extrinsic act evidence. Lane's motion for bond pending appeal is not meritorious on this issue.

**2. Exclusion of Evidence:**

Lane's next claim is that he should have been permitted to present evidence that he lacked the specific intent required under § 1014. Lane argues that during his case-in-chief he sought the introduction of certain evidence to establish that: (1) the identity of the grocery store tenant was not material to ANB because ANB had structured the transaction to ensure that it would not incur any losses; and (2) Lane lacked any intent to influence the bank in connection with the grocery store lease. Lane concludes that the exclusion of this evidence was in error because it was highly relevant

to his state of mind at the time the alleged crime was committed. Specifically, Lane argues that he

"understood the structure of the transaction and the relative financial positions and motivations of

the parties to the transactions." (Def.'s Memo in Supp. of Mot. for Release Pending Appeal, p. 11.)

The government argues that none of the issues identified by Lane having any bearing on the false

statements charged under § 1014, particularly when materiality and risk of loss are irrelevant. In

terms of the exclusion of evidence allegedly supporting a lack of specific intent required under §

1014, no substantial question exists that would allow release pending appeal.

Section 1014 of Title 18 of the United States Code states the following, in pertinent part:

> Whoever knowingly makes any false statement or report, or willfully
> overvalues any land, property or security, for the purpose of
> influencing in any way the action . . . of any institution the accounts
> of which are insured by the Federal Deposit Insurance Corporation .
> . . upon any application, advance, discount, purchase, purchase
> agreement, repurchase agreement, commitment, or loan, or any
> change or extension of any of the same, by renewal, deferment of
> action or otherwise, or the acceptance, release, or substitution of
> security thereof, shall be fined not more than $1,000,000 or
> imprisoned not more than 30 years, or both.

18 U.S.C. § 1014. Section 1014 criminalizes "knowingly mak[ing] any false statement or report .

. . for the purpose of influencing in any way the action" of a Federal Deposit Insurance Corporation

(FDIC) insured bank "upon any application, advance, . . . commitment, or loan." United States v.

Wells, 519 U.S. 482, 490 (1997) (citing 18 U.S.C. § 1014). Nowhere does § 1014 say that a material

fact must be the subject of the false statement, or even so much as mention materiality. Id. By

materiality, the court means "ha[ving] a natural tendency to influence, or [being] capable of

influencing, the decision of the decision-making body to which it was addressed." United States v.

Pribble, 127 F.3d 583, 588 (7th Cir. 1997) (citing Wells, 519 U.S. at 483) (citations and internal

41

quotations omitted). To the contrary, § 1014's terms cover "any" false statement that meets the other requirements in the statute, and the term "false statement" carries no general suggestion of influential significance. Wells, 519 U.S. at 490. The proper interpretation of § 1014 is one that excludes any element of materiality. United States v. Swanquist, 161 F.3d 1064, 1075 (7th Cir. 1998) (citing Wells, 519 U.S. at 490-91); see also United States v. Reynolds, 189 F.3d 521, 525-526 (7th Cir. 1999); United States v. Krilich, 159 F.3d 1020, 1028 (7th Cir. 1998)

Lane asserts that he lacked any intent to influence ANB in connection with the grocery store lease. As the Government correctly argues, Lane's assertions are irrelevant, hearsay, and even if admissible, then correctly excluded under Rule 403. At trial, Lane sought to introduce testimony and documents of a conversation he had with ANB bankers and lawyers on February 16, 1994 and a February 28, 1994 memo from Willard Nyman to Jason Choulochas, which confirmed the conversation of February 16th. At that meeting, Lane indicates that he informed ANB that he was "negotiating with other, potentially better tenants than Shopper's Lane for the grocery store space, and that he asked Leonard Muhammad to postpone opening of Shopper's Lane for that reason." (Def.'s Memo in Supp. of Mot. for Bond Pending Release, p. 10.) It is unclear how this alleged conversation of February 16, 1994 is relevant to the false statements made in connection with the refinancing on November 1, 1993. The Government has demonstrated that the situation on November 1, 1993 was that no anchor tenant was in place, and that the lease that had been executed prior to November 1, 1993 was worthless. The fact that Lane may have asked Muhammad to delay opening for another tenant is not only meaningless in terms of evidentiary value, but is also an admission that Lane made false representations concerning the effectiveness of the executed lease. Section 1014's terms cover "any" false statement that meet the other requirements in the statute, and

the term "false statement" carries no general suggestion of influential significance. <u>Wells</u>, 519 U.S. at 490. Thus, the conversation on February 16th and the memo of February 28th are not relevant to the statements made on November 1, 1993.

Additionally, the conversation on February 16th as well as the memo of February 28th both represent inadmissible hearsay. Federal Rule of Evidence 801 states the following: "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. Lane contends the conversation of February 16th and the memo of February 28th should have been admitted because they speak to his intent to acquire a reliable anchor tenant, as per the lease, by asking Muhammad to hold off. Thus, this evidence is offered for the truth of the matter asserted. It is obvious that the conversation on February 16th and the memo of February 28th are hearsay. Federal Rule of Evidence 802 provides that hearsay is not admissible, but Rule 803 lists several exceptions to the rule against hearsay. In a possible act of concession, Lane does not touch upon the fact that the February 16th conversation or the memo of February 28th are hearsay, nor does Lane attempt to argue an exception that would allow admission. Lane instead implies such an exception when he mentions that the conversation of February 16th and memo of February 28th are relevant to his "state of mind" at the time the crime occurred. The exception this implicates falls under Rule 803(3), which states "a statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will are not excluded by the hearsay rule." Fed. R. Evid. 803(3). As the Government points out, the Seventh Circuit holds

that post-offense statements of a defendant that are purportedly inconsistent with guilt are inadmissible under Rule 803(3) if the defendant had any opportunity to fabricate a story. See United States v. Macey, 8 F.3d 462, 467 (7th Cir. 1993) (statements offered under Rule 803(3) must be contemporaneous with the event sought to be proven); United States v. Neely, 980 F.2d 1074, 1083 (7th Cir. 1992) (three requirements to fall under the exception: (1) the statement must be contemporaneous with the mental state sought to be proven; (2) it must be shown that declarant had not time to reflect, that is, not time to fabricate or misrepresent his thoughts; and (3) the declarant's state of mind must be relevant to an issue in this case); United States v. Harvey, 959 F.2d 1371, 1375 (7th Cir. 1992) (to be admissible under Rule 803(3), a statement must be made under circumstances showing that the declarant had no time to reflect and perhaps misrepresent his thoughts.) In this case, Lane had from November 1, 1993 until February 16, 1994 to develop an explanation why the lease was not a sham document. Even with this three months, Lane is still only able to lamely offer that he was considering potentially better tenants for the anchor tenant. This explanation leads only to speculation in the face of statements Lane actually made to acquire refinancing. The conversation of February 16th and the memo of the February 28th, months later, are hearsay, and do not fall under an exception, and thus, are inadmissible.

Lastly, the conversation on February 16th and the memo of February 28th both are inadmissible under Federal Rule of Evidence 403. Rule 403 states "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Lane argues the conversation on February 16th and the memo of February 28th are highly relevant to his "state of mind . . ." and

"helps establish that Lane understood the structure of the transaction and the relative financial positions and motivations of the parties to the transaction." (Def.'s Memo in Supp. of Mot. for Release Pending Appeal, p. 11.) The Government counters that the conversation on February 16, 1994 and the memo of February 28, 1994 are irrelevant, particularly since materiality is not an element of the crime charged, § 1014. Again, the court is persuaded by the Government's argument. Rule 403 allows a court to weigh the probative value of evidence against the "danger of unfair prejudice, confusion of the issues, or misleading the jury" Swanquist, 161 F.3d at 1074; see also Tidemann v. Nadler Golf Car Sales, Inc., 224 F.3d 719, 723-724 (7th Cir. 2000). To allow presentation of the conversation and memo would be an attempt to address the materiality of the false statements of November 1, 1993. See Swanquist, 161 F.3d at 1075 (the proper interpretation of § 1014 is one that excludes any element of materiality.) Lane cannot ignore Wells.

Additionally, Lane argues that the court should have allowed him to present the testimony of Father Raymond Baumhart, S.J. and Jason Choulochas. These two witnesses would have revealed Loyola's involvement in the refinancing and the effect on the transaction of Loyola's put agreement with ANB, which Lane claims was "highly relevant to [his] state of mind . . ." and "helps establish that [he] understood the structure of the transaction and the relative financial positions and motivations of the parties to the transaction." (Def.'s Memo in Supp. of Mot. for Release Pending Appeal, p. 11.) Specifically, Lane sought the testimony of Father Baumhart and Mr. Choulochas in order to prove: (1) Loyola had been involved with the shopping center since its inception; (2) that Loyola determined to go forward with the refinancing for financial and community-based reasons; (3) that it was only because of Loyola's involvement that ANB was involved; (4) that Loyola's put agreement eliminated all financial risk to ANB; (5) that ANB in fact suffered no harm because of

45

the way the deal was structured from the very start; and (6) Lane was fully aware of Loyola's commitment to the project, the terms of the Loyola put, and its effect on ANB's position. Lane also argues that the court precluded evidence that ANB knew Lane's financial status, and determined they would not do the deal without Loyola's backing. The Government argues that this evidence was properly excluded because it was irrelevant and excluded under Rule 403. The court agrees.

First, the evidence of Loyola's motivations and ANB's financial exposure is irrelevant to the crime that is charged. Again, the proper interpretation of § 1014 is one that excludes any element of materiality. Swanquist, 161 F.3d at 1075 (citing Wells, 519 U.S. at 490-91). The issues that are relevant involve whether Lane made the charged false statements, whether he did so knowingly, and whether he did so with the intent to influence the bank. Loyola's motivations and ANB's financial exposure do not affect these abovementioned issues. Lane, even with the alleged knowledge of Loyola's motivations and ANB's financial exposure, still made false statements during his proposed refinancing. Further, the court allowed into evidence aspects of Loyola's motivation and ANB's financial exposure through introduction of the loan documents and testimony of witnesses as to the requirements of the loan.

Evidence of Loyola's motivations and ANB's financial exposure were properly excluded under Federal Rule of Evidence 403, which provides: "[a]lthough relevant, evidence may be exclude if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403. Lane again contends that Loyola's motivations and ANB's financial exposure are relevant to his "state of mind . . ." and "helps establish that he understood the structure of the transaction and the relative financial positions and

motivations of the parties to the transaction." (Def.'s Memo in Supp. of Mot. for Release Pending Appeal, p. 11.) Loyola's motivations and ANB's financial exposure are entirely irrelevant, particularly since materiality is not an element of the crime charged. Further evidence of Loyola's motivations and ANB's financial exposure would lead to confusion. Rule 403 allows a court to weigh the probative value of evidence against the "danger of unfair prejudice, confusion of the issues, or misleading the jury." Swanquist, 161 F.3d at 1074; see also Tidemann, 224 F.3d at 723-724. Once again, materiality is not an issue. See Swanquist, 161 F.3d at 1075 (the proper interpretation of § 1014 is one that excludes any element of materiality.)

Lane has failed to raise a substantial question in regard to any evidence that was excluded at trial. Further, and more significantly, nothing that occurred at trial could legitimately justify a finding of abuse of discretion by this court in regard to the exclusion of evidence. See Swanquist, 161 F.3d 1074 (discussing special deference paid to discretion of court) (Coffey, J.). As with the other issues Lane raises in this motion, he offers nothing to demonstrate that there is a substantial question of law or fact concerning the exclusion of this evidence, although it is his burden to do so. 18 U.S.C. § 3143(b)(1)(B); Bilanzich, 771 F.2d at 298.

### III.   CONCLUSION

As noted at the outset of this opinion, Lane moved the court for both release pending appeal, and to delay his surrender date until the court had decided the motion for release.   On January 15, 2002, the court issued a minute order stating that Lane's motions were denied, and that this opinion would follow.   For all the reasons discussed above, Lane's motions were and are denied.

IT IS SO ORDERED.

ENTER:

CHARLES RONALD NORGLE, SR.

DATED: _1/29/02_